UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | Crim. No. 5:25-cr-00086-GFVT-MAS-1 |
| V. | ) ) ) | **MEMORANDUM OPINION** |
| LAURANCE D NEWBY, | ) ) | **&** |
| Defendant. | ) ) | **ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Newby's Objection to Report and Recommendation [R. 42.] Mr. Newby moved to suppress evidence obtained during the warrantless search of his person and vehicle on the grounds that the United States did not have probable cause to justify either search. [R. 22.] Magistrate Judge Matthew A. Stinnett held a suppression hearing on September 22, 2025, heard arguments from Mr. Newby and the United States, and took Mr. Newby's motion under advisement. [R. 34.] On October 14, 2025, Judge Stinnett issued a Report and Recommendation ("R&R"), advising this Court to deny Mr. Newby's motion to suppress. [R. 37.] Judge Stinnett's R&R provided that each party had seven days with which to file an objection. *Id.* at 27. Mr. Newby objected to the R&R, requesting that this Court suppress the evidence. [R. 42.] For the reasons that follow, Judge Stinnett's Recommendation to deny Mr. Newby's Motion to Suppress will be **ADOPTED** and Mr. Newby's Objections **[R. 42]** are **OVERRULED.**

**I**

Judge Stinnett's exhaustive and thorough description of the facts in this case — and the failure of either party to contest the factual background section in Judge Stinnett's Report and

Recommendations — does not require that this Court reproduce a moment-by-moment account of the day of Mr. Newby's arrest. *See* [R. 37 at 1–7.] The Court will, nevertheless, provide an overview of the critical facts informing the legal issues that Mr. Newby raised in his objection.

Mr. Newby has been the subject of a drug trafficking investigation since October 2024. [R. 36 at 4.] The Drug Enforcement Administration ("DEA") identified Mr. Newby as a "retail distributor of illegal drugs in the central Kentucky area." [R. 1 at 3.] On June 25, 2025, members of the DEA's Lexington Resident Office ("LRO") and Lexington Police Department ("LPD") Narcotics Enforcement Unit ("NEU") identified Mr. Newby's Range Rover parked at the Avid Hotel Lexington at 1810 Bryant Road.[1] *Id.* By this stage of the investigation, law enforcement had Newby under regular personal and electronic surveillance. [R. 36 at 5.] Law enforcement also knew that Mr. Newby carried a firearm when conducting drug sales in the Lexington area. *Id.* By June 3, both the DEA and the Kentucky State Police ("KSP") conducted controlled buys involving Mr. Newby.[2] [R. 36 at 5, 140; R. 30 at 1.]

The events of June 25 began when Mr. Newby exited the hotel and deposited items, including a duffel bag, into his parked Range Rover. [R. 37 at 3.] Mr. Newby locked his vehicle, checked to ensure that the doors were locked, and then proceeded to go for a run on the Brighton Trail. *Id.* After Mr. Newby left his car, a KSP unit arrived with Bella, a certified drug detection dog. [R. 30 at 2.] KSP Trooper Kenneth Leavell, Bella's handler, deployed Bella to conduct an open-air sniff around Mr. Newby's vehicle. [R. 36 at 65.] Bella positively alerted for the odor of narcotics. *Id.*

Meanwhile, on the Brighton Trail, law enforcement endeavored to locate Mr. Newby.

---

[1] By June 25, 2025, law enforcement knew that the Range Rover in question, Kentucky license plate E2Y365, was registered in the name of "Laurance D. Newby." [R. 1 at 3.]
[2] The United States later added these controlled drug purchases as Counts 1–3 to the Superseding Indictment. [R. 46.]

2

[R. 37 at 4.] DEA Special Agent Jason Moore identified that Mr. Newby was still on Brighton Trail and contacted the case agent, Christy McHugh, with this information. [R. 36 at 10.] Prior to the events of June 25, Moore conducted extensive personal surveillance of Mr. Newby and was confident that he could identify him in public. *Id.* at 9–10. After identifying Mr. Newby, Task Force Officer David Lewis and two uniformed KSP officers approached Mr. Newby as he sat on a park bench. *Id.* at 10–11. The officer's asked Mr. Newby to confirm his identity, and after removing his sunglasses, hood, and earphones, Mr. Newby confirmed who he was. [R. 37 at 4–5.]

At this point, the officers asked Mr. Newby to accompany them to another location to speak. *Id.* at 5. Mr. Newby asked whether he was under arrest. *Id.* The officers told him, "No, not yet. But I will explain everything in the car. I just don't want it to be out in the open." *Id.* This reflects the officer's initial desire to speak with Mr. Newby in order to secure his cooperation in the investigation. [R. 36 at 5.] Despite knowing that Mr. Newby could be armed, the officers wanted to maximize the possibility that "if he wanted to cooperate," any interaction with police in a public setting would be minimal. *Id.* at 5–6. The officers wanted to see whether Mr. Newby would cooperate with law enforcement in the investigation of other drug trafficking targets and did not want to cause a scene that might attract media or public attention. Despite this planned approach, Lewis stated that he believed the officers had probable cause to arrest Mr. Newby "based on the narcotics investigations that we had previous to that." *Id.* at 137.

Mr. Newby turned to face the officers holding his sunglasses and phone in his right hand. [R. 37 at 5.] It was at this point that Lewis noticed a bulge in Mr. Newby's left pocket. [R. 36 at 136.] Lewis asked Mr. Newby whether he was armed, and Mr. Newby backed away from Lewis, patted his pocket, and responded that he was not. [R. 37 at 6.] At this point, Lewis asked

3

whether he could conduct a pat-down on Mr. Newby, to which Mr. Newby responded, "I don't have nothing on me," fully reached into his pocket, and began turning away. *Id.* One of the officers on the scene testified at the suppression hearing that "[t]he fact that when he was asked to be patted down, that he immediately grabbed that left pocket was obviously a red flag for all of us." [R. 36 at 104.] Mr. Newby then fled from the officers. [R. 37 at 6.]

Officers chased Mr. Newby, tased him, and placed him in handcuffs. *Id.* Officers then searched his pockets and discovered cash, a set of keys, and a bag containing cocaine.[3] *Id.* After arresting Mr. Newby, officers searched his vehicle. "In the backseat of the vehicle, investigators located a backpack which further contained approximately 1.016 kilograms of suspected cocaine, a loaded Glock 26 firearm (serial number AHPW601) with a round chambered, and digital scales. In the rear cargo area of the Range Rover and inside a natural void, investigators located and seized approximately 462 gross grams of suspected fentanyl broken down into multiple packages, consistent with amounts utilized for retail distribution." [R. 1-1 at 4.]

On July 3, 2025, the United States entered a three-count indictment charging Mr. Newby with possession with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, possession with intent to distribute 500 grams or more of a mixture or substance containing cocaine, and possession of a firearm in the furtherance of a drug trafficking crime. [R. 7.] A Superseding Indictment returned on October 23, 2025, added three additional counts for knowingly and intentionally distributing 40 grams or more of a mixture or substance containing a detectable amount of fentanyl. [R. 46.] Mr. Newby made his initial appearance before Magistrate Judge Stinnett on July 8, 2025. [R. 12.] Mr. Newby remains in detention awaiting trial. [R. 18.]

---

[3] Officers field tested the white substance in the bag which revealed the substance as cocaine. [R. 1-1 at 4.]

4

**II**

Mr. Newby raised three objections to Judge Stinnett's Report and Recommendations. The Court reviews this matter *de novo*. 28 U.S.C. § 636(b)(1). The Court reviews "those portions of the report or specified proposed findings or recommendations to which an objection is made." *Id.* "A specific objection 'explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic.'" *United States v. Conley*, 290 F. Supp. 3d 647, 653 (E.D. Ky. 2017) (citing *Robert v. Tesson*, 507 F.3d 981, 944 (6th Cir. 2007)). General objections failing "to identify specific factual or legal issues from the report and recommendation" are not permitted. *Id.*

**A**

The Court turns first to Judge Stinnett's finding that probable cause did not exist to conduct a warrantless arrest of Mr. Newby.[4] *See* [R. 37 at 18–19.] The question before the Court is whether probable cause existed to arrest Mr. Newby on June 25, 2025.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "A seizure occurs when police detain an individual under circumstances where a reasonable person would not feel free to leave." *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 613 (6th Cir. 2015). Arrests plainly constitute a seizure under the Fourth Amendment. *Torres v. Madrid*, 592 U.S. 306, 312 (2021). "Because arrests are 'seizures' of 'persons,' they must be reasonable under the

---

[4] No party challenged Judge Stinnett's determination that probable cause did not exist. The Court reviews this finding given the seismic impact that it has throughout both Judge Stinnett's Recommendation and Report and Mr. Newby's objections.

5

circumstances." *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018).

"A warrantless arrest by a law officer is reasonable under the Fourth Amendment where the arrest is in public and there is probable cause to believe that a criminal offense has been or is being committed." *United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006) (citing *United States v. Watson*, 423 U.S. 411, 417–24 (1976)). Officers have probable cause to arrest where "facts and circumstances within their knowledge and of which they had reasonably trustworthy information" would lead a prudent person to believe that the defendant had committed or was committing a criminal offense. *United States v. Davis*, 421 F. Supp. 3d 433, 441 (E.D. Ky. 2019). Courts evaluate the events leading to the arrest from the objective standpoint of a reasonably prudent officer. *Id.* Probable cause requires a showing of more than mere suspicion, but "does not require that [officers] possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt." *Id.* (citing *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006)). The United States has the burden of proving that probable cause existed at the time of the arrest. *United States v. Porter*, 701 F.2d 1158, 1165 (6th Cir. 1983).

The exclusionary rule prohibits the introduction of any evidence gathered from the result of an unreasonable search or seizure. *United States v. Buford*, 632 F.3d 264, 270 (6th. Cir. 2011) (citing *Herring v. United States*, 555 U.S. 135, 136 (2009)). A Fourth Amendment violation does not, however, immediately trigger the suppression of evidence. *Herring*, 555 U.S. at 137. Instead, "the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Id.* The Court should suppress the evidence only if the law enforcement officers knew or should have known that the search was unconstitutional under the Fourth Amendment. *Id.* at 143 (citing *Illinois v. Krull*, 480 U.S. 340, 348–49 (1987)). The

6

exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 144.

It is not clear from the facts before the Court that police acted without probable cause when they arrested Mr. Newby. Nor is it clear, in the alternative, that they acted in a way that was "deliberate, reckless, grossly negligent," or part of a pattern of "recurring or systemic negligence." Further, there appears to be sufficient factual backing for the government's reliance on the controlled buys to support probable cause to make an arrest.

In its response to Mr. Newby's original suppression motion, the United States argued that "there was more than sufficient information for the establishment of probable cause based on the three prior controlled substances transactions." [R. 30 at 2.] However, government counsel shied away from fully embracing this argument at the suppression hearing. *See* [R. 36 at 23–28.] Counsel for the United States told the Court state charges "brought against him at the time" and "the items found inside the vehicle" also supported a finding of probable cause. *Id.* at 26.

The officers on the ground believed that they had probable cause to arrest Mr. Newby based on the controlled buys. DEA Agent Moore told the Court that if Mr. Newby did not cooperate that day, the police would have arrested him on the basis of the controlled buys. *Id.* at 35, 37, 40. Task Force Officer Lewis believed that the previous narcotics investigations gave police probable cause to arrest Mr. Newby on June 25. *Id.* at 137. Kentucky State Trooper Don McCormick, who assisted with the arrest, believed at the time that there was enough information to support the arrest. *Id.* at 110. It is well established that controlled drug purchases are sufficient to support the finding of probable cause needed to make a warrantless arrest. *See United States v. Moore*, 999 F.3d 993, 997 (6th Cir. 2021) ("even a single controlled purchase can be sufficient to establish probable cause to believe that evidence of drug trafficking is

present"); *United States v. Abdalla*, 972 F.3d 838, 849–50 (6th Cir. 2020) (Court found that controlled buys presented ample evidence of probable cause); *United States v. Florence*, 150 F.4th 773, 777 (6th Cir. 2025) (Court found that a single controlled buy "plainly" sufficed for probable cause).

The Court finds that probable cause supported the officers' collective belief that they had the authority to arrest Mr. Newby on June 25, 2025, before engaging him on the trail. "A determination of whether probable cause existed requires us to examine the totality of the circumstances, and we may 'consider only the information possessed by the arresting officer at the time of the arrest.'" *Everson v. Leis*, 556 F.3d 484, 498 (6th Cir. 2009) (quoting *Harris v. Bornhorst,* 513 F.3d 503, 511 (6th Cir. 2008)). Five individuals were present during the arrest of Mr. Newby: DEA Agents Moore and McHugh, KSP Troopers Thomas Sanders and McCormick, and Task Force Officer Lewis. [R. 36 at 16–17.] On June 25, all reasonably believed that probable cause existed to arrest Mr. Newby because of the controlled buys and the information of the confidential informant who participated in those purchases. Critically, at least one of these arresting officers — DEA Task Force Officer Lewis — testified at the suppression hearing that he personally witnessed Mr. Newby sell drugs to a confidential informant.[5] [R. 36 at 142–43.] This first-hand witnessing of criminal activity certainly gave Lewis probable cause to arrest Mr. Newby for crimes that My. Newby had previously committed in that officer's presence.

The Sixth Circuit recognizes the collective knowledge doctrine, which holds that that an officer may act based on information obtained by fellow officers. *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012) (citing *United States v. Barnes*, 910 F.2d 1342, 1344 (6th Cir.

---

[5] Under cross-examination from defense counsel, Officer Lewis stated that "I have witnessed Mr. Newby selling drugs" and "Yes, I have witnessed him -- yes, I witnessed him sell drugs to a confidential informant, yes, sir." [R. 36 at 142–43.]

8

1990)). In *Lyons*, the Sixth Circuit upheld the constitutionality of an arrest by Michigan state police who stopped and later arrested the defendant based on the existence of an ongoing DEA investigation. *Id.* at 767, 771. The Court found that the knowledge of the ongoing DEA investigation could be imputed to the state police for the purpose of conducting the initial stop, which led to the defendant's arrest. *Id.* at 766. Here, too, the collective information of the DEA investigation could be imputed onto the arresting officers, particularly since one of these officers, Lewis, had witnessed Mr. Newby commit a crime in his presence. Based on the totality of the circumstances, the record indicates that Lewis, McHugh, Sanders, McCormick, and Moore had facts and circumstances within their knowledge that were sufficient to warrant a prudent person, or one of reasonable caution, in believing that Mr. Newby had committed a criminal offense warranting arrest.[6] *See Mills v. Owsley County Kentucky*, 483 F.Supp.3d 435, 470 (E.D. Ky. 2020) ("In evaluating probable cause, the Court looks at the totality of the circumstances, from the perspective of a reasonable on-scene officer.").

**B**

Mr. Newby objects that reasonable suspicion did not exist either to approach Mr. Newby in the first place or to support a belief that Mr. Newby was armed. For the following reasons, the Court agrees with Judge Stinnett's findings and overrules Mr. Newby's objections.

The Sixth Circuit recognizes three types of civilian-police encounters: (1) "contact initiated by a police officer without any articulable reason whatsoever;" (2) contact that is

---

[6] Defense counsel, counsel for the United States, and Judge Stinnett addressed the contention that defense counsel did not have any discovery materials relating to the controlled buys at the time of the Suppression Hearing. [R. 36 at 22–29.] Counsel for the United States advised the Court that they planned to produce that information for the Defense. [R. 36 at 27.] Additionally, the United States filed a Superseding Indictment which appears to include charges for the three controlled buys dated December 9, 2024, March 20, 2025, and June 9, 2025. [R. 46.] Probable cause to arrest is judged by an analysis of the totality of the circumstances, the evidence of which is weighed "not in terms of library analysis by scholars but as understood by those versed in the field of law enforcement." *Illinois v. Gates*, 462 U.S. 213, 232 (1983) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

"predicated upon 'reasonable suspicion' – the classic *Terry* stop;" and (3), is "when officers have probable cause to believe a crime has been committed and that the person stopped committed it." *United States v. Flowers*, 909 F.2d 145, 147 (6th Cir. 1990). "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Pursuant to *Terry v. Ohio*, 391 U.S. 1 (1968), "a warrantless encounter may be countenanced under the Fourth Amendment if an officer has reasonable suspicion that criminal activity may be afoot." *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008). "Reasonable suspicion requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop." *Id.* at 370–71 (quoting *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008)). The Sixth Circuit recognizes that police may conduct "precautionary searches for weapons following a lawful *Terry* stop, known as *Terry* frisks, where there is 'reasonable suspicion that the person searched may be armed and dangerous.'" *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (citing *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016)).

Mr. Newby raises two objections based on lack of reasonable suspicion. Mr. Newby argues that "because the stop was not undertaken to pursue the alleged reasonable suspicion, it falls outside *Terry*'s narrow exception and constitutes a de facto arrest unsupported by probable cause." [R. 42 at 4.]

1

The question before the court is whether officers were acting on reasonable suspicion

when they stopped Mr. Newby.  The defendant argues that a *Terry* stop "is justified only when officers act to confirm or dispel the suspicion that prompted the stop." [R. 42 at 2.]  He then argues that because Mr. Newby "had already been fully identified before officers ever approached him," the *Terry* stop was unlawful and unsupported by reasonable suspicion.  The main thrust of Mr. Newby's first objection is that because police planned to speak to Mr. Newby, they cannot rely on a *Terry* theory to justify the later arrest of Mr. Newby.

Mr. Newby claims that this distinction is "constitutionally significant." *Id.* at 3.  He is mistaken.  There is no constitutional bar on police officers approaching citizens and engaging them in conversation for any reason.  It does not matter that police attempted to "carry out a preplanned 'soft approach' aimed at securing his cooperation," as Mr. Newby suggests.  *Id.*

To conduct a *Terry* stop, police need only have a reasonable, articulable suspicion that criminal activity is afoot.  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Police had that suspicion here.  The officers were aware of the long-standing investigation into Mr. Newby which included personal surveillance.  The officers were aware of the controlled purchases that Mr. Newby made with confidential informants.[7]  Officers witnessed Mr. Newby placing a bag into his Range Rover and meticulously ensuring that the vehicle was secure before leaving it. [R. 37 at 19.]  Critically, the officers on the trailhead engaging Mr. Newby were aware of Bella the drug dog's positive alert to the scent of narcotics in the Range Rover, although officers had not yet entered the vehicle.  *Id.*  The officers had enough evidence to articulate a "moderate chance of finding evidence of wrongdoing." *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022).  Police had reasonable suspicion when they engaged Mr. Newby on the trailhead that

---

[7] These controlled purchases have since been added to the superseding indictment. *See* [R. 46.]  Judge Stinnett did not believe that the controlled purchases could support either reasonable suspicion or probable cause analysis.  For the reasons already enumerated throughout this Memorandum Opinion & Order, this Court finds that the evidence of the controlled purchases supported both a probable cause and reasonable suspicion analysis.

11

"criminality may be afoot," whether on his person or in his vehicle.

## 2

Mr. Newby next objects that police did not have reasonable suspicion to believe he was armed and dangerous. [R. 42 at 4.] Thus, the attempted frisk would be unconstitutional. It is well-established that police act constitutionally when they conduct a precautionary frisk for weapons. *McCallister*, 39 F.4th at 373; *Pacheco*, 841 F.3d at 390; *Terry*, 392 U.S. at 30; *Ybarra v. Illinois*, 444 U.S. 85, 93–4 (1979). Police must still have reasonable suspicion that the person frisked is armed or dangerous. *Ybarra*, 444 U.S. at 94.

Courts use a totality of the circumstances analysis in determining whether police acted with reasonable suspicion. *McCallister*, 39 F.4th at 375. The Sixth Circuit recognizes that furtive movements consistent with hiding a weapon or object can justify reasonable suspicion that a defendant was armed. *United States v. Tillman*, 543 F. App'x 557, 561 (6th Cir. 2013). Fleeing from police can justify reasonable suspicion. *United States v. Jeter*, 721 F.3d 746, 755 (6th Cir. 2013) (finding that a *Terry* stop was justified where a defendant fled in response to the presence of law enforcement and grabbed the front pocket of his shorts as he fled, giving officers the belief that he possibly had contraband). A person's "outward, ostensibly evasive behavior" such as concealing the contents of a pocket "may be relevant to a reasonable suspicion inquiry" and is "one factor to be considered by the court." *United States v. Arrington*, 440 F. Supp. 3d 719, 728 (E.D. Mich. 2020) (citing *Wardlow*, 528 U.S. at 124). Observations that a defendant "had a bulge in his pocket" which an officer believed could be a weapon supports reasonable suspicion under *Terry* to justify a brief precautionary frisk. *United States v. Bell*, 572 F. App'x 417, 419 (6th Cir. 2014).

All of these circumstances existed on June 25, and all support a finding that reasonable

suspicion existed at the time. Mr. Newby claims that the officers' "calm demeanor" and "conversational tone" meant that none of the officers perceived Mr. Newby as presenting a threat. [R. 42 at 5.] The record, however, is replete with instances of officers describing their belief that Mr. Newby could be armed. *See* [R. 37 at 90, 93, 94–95, 120, 135, 152.] Officers observed a bulge in Mr. Newby's left pocket, leading them to ask Mr. Newby if he was armed.[8] *Id.* at 121. As Lewis approached Mr. Newby and before he could "actually touch [him]," Mr. Newby broke off in a run to flee. *Id.* at 122. It is well-established in this Circuit that "if officers have reasonable suspicion that an individual has committed or is committing a crime, and when approached by officers the individual flees or attempts to flee, the reasonable suspicion 'ripens' into probable cause." *United States v. Williams*, 475 F. App'x 36, 39 (6th Cir. 2012). This Court agrees with Judge Stinnett that "the officers' reasonable suspicion ripened into probable cause to arrest Newby once he fled" and that "the warrantless arrest of Newby was reasonable and lawful." [R. 37 at 24.]

### C

Finally, Mr. Newby argues that all evidence seized from Mr. Newby's Range Roger are fruits of the poisonous tree and must be suppressed. The question before the Court is whether the fruit of the poisonous tree doctrine applies to the facts of this case.

The fruit of the poisonous tree doctrine bars the admissibility of evidence which police obtain from an unconstitutional arrest or seizure. *United States v. Galaviz*, 645 F.3d 347, 354 (6th Cir. 2011). The Court looks first to whether the seizure or arrest was unconstitutional in the first place. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Next, the Court must

---

[8] At the suppression hearing, Lewis stated that "[i]t definitely makes me worried that I just asked him if he had any weapons on him, and when I did ask him, he went straight for his pocket. Which could indicate to me that there was a firearm in his pocket that he was reaching for." [R. 36 at 121.]

determine whether the police exploited that illegality to obtain the later evidence. *Id.* Evidence derived from illegal police conduct may still be admissible if it is sufficiently attenuated from the original illegal search. "The Supreme Court has set forth three factors to guide the attenuation inquiry: 'the temporal proximity of the unlawful [conduct] and the emergence of the incriminating evidence at issue, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.'" *United States v. Waide*, 60 F.4th 327, 339 (6th Cir. 2023) (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

     As discussed earlier, the Court does not find that the arrest of Mr. Newby violated the Constitution. Even assuming *in arguendo* that probable cause did not exist to arrest Mr. Newby when the officers encountered him on the trailhead, the officers made a lawful arrest after encountering Mr. Newby with reasonable suspicion that criminality was afoot. After Mr. Newby fled from police while concealing an object in his pocket, the officers' reasonable suspicion ripened into probable cause to arrest Mr. Newby. *Williams*, 475 F. App'x at 39.

     The seizure of Mr. Newby's car keys fell within the search incident to arrest exception to a warrantless search. "Under the search incident to a valid arrest exception, a lawful custodial arrest justifies a contemporaneous warrantless search of the person arrested, as well as of the immediately surrounding area." *United States v. Guy*, 1 F. App'x 410, 412 (6th Cir. 2001). Officers "may seize both contraband and any instrumentalities, fruits, or evidence of a crime that they discover in the course of a search." *United States v. Stewart*, 315 F. App'x 554, 559 (6th Cir. 2009). In *Stewart*, the Sixth Circuit held that police may seize car keys where police believe the vehicle may contain fruits, evidence, or instrumentalities of an offense. *Id.* at 560. The police in *Stewart* did not conduct a physical search of the vehicle's interior using the car keys until after they had probable cause based on a drug-detection dog's positive hit on the vehicle.

14

*Id.* The similarities between *Stewart* and this case are striking. When police seized Mr. Newby's keys, they had reason to believe that the Range Roger contained fruits, evidence, or instrumentalities of a drug-trafficking offense based on their knowledge that Bella had positively alerted to the presence of drugs inside the vehicle.[9] [R. 36 at 65.] Police did not enter Mr. Newby's vehicle under after Bella's positive alert and Mr. Newby's arrest. *Id.* at 124–25.

Officers performed a lawful custodial arrest on Mr. Newby. They legally searched his person and could seize contraband as well as any instrumentalities of a crime. The seizure of Mr. Newby's keys was constitutional where police had reason to believe that the vehicle contained fruits of drug trafficking. The subsequent search of Mr. Newby's vehicle, resulting in the seizure of cocaine, fentanyl, and the Glock 26 firearm, was constitutional. Because none of these events violated the Fourth Amendment, there is no fruit of the poisonous tree analysis for the court to apply. The evidence seized from the vehicle falls squarely within existing exceptions to the Fourth Amendment's warrant requirements.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Defendant's Objections **[R. 42]** to the Magistrate Judge's Report and Recommendations are **OVERRULED**;

2. Mr. Newby's Motion to Suppress **[R. 22]** is **DENIED**.

---

[9] Before DEA Agent Moore encountered Mr. Newby on the trail, Moore knew that Bella the drug dog had already positively alerted for the odor of narcotics emanating from the Range Rover. [R. 36 at 8, 10.] Officer Evans stated that it was his opinion that Mr. Newby had drugs in the some of the bags that he placed in the vehicle. *Id.* at 45, 57.

This the 18th day of November, 2025.

Gregory F. Van Tatenhove
United States District Judge